USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: March 30, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CHELSEA GRAND, LLC,                                :

               *Plaintiff*,                :                09 Civ. 924 (PAC)

     -against-                             :                **OPINION & ORDER**

                                        :

INTERSTATE HOTELS & RESORTS, INC., and
INTERSTATE MANAGEMENT COMPANY,      :

               *Defendants*.              :
-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

     Defendants Interstate Hotels and Resorts ("IHR") and Interstate Management Company

("IMC") ("together Interstate"),[1] move to dismiss Chelsea Grand, LLC's ("Chelsea") Third

Amended Complaint ("TAC"), for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).

The TAC alleges three causes of action:  (1) Breach of the Hotel Management Agreement

("HMA") signed by Chelsea and Interstate in February, 2003; (2) Intentional Breach of Fiduciary

Duty; and (3) Negligent Breach of Fiduciary Duty.  The Court has previously determined that

Interstate did not promise to operate the Chelsea as a non-union hotel; and that Chelsea and

Interstate had an arms-length relationship, not a fiduciary one.  Chelsea is not free to relitigate

these issues.  Accordingly, the defendants' motion to dismiss is granted.

     The TAC is based on events that occurred more than a decade ago, and which were the

subject of prior litigation between Chelsea, and the New York Hotel and Motel Trade Council,

AFL-CIO ("Hotel Workers Union").  After a two week, non-jury trial, in which Interstate also

participated, this Court confirmed an arbitral award by the Impartial Chairman of a joint union-

---

[1] IHR and IMC are separate and distinct entities, but Chelsea treats them as one.  For the purpose of deciding this motion, the Court will refer to the two entities as Interstate.

employer entity in favor of the Hotel Workers Union ("Chelsea I"). Chelsea Grand, LLC v. New York Hotel and Motel Trades Council, AFL-CIO, 07 Civ. 2614 (PAC), 2014 WL 4813028 at *3, (S.D.N.Y. September 29, 2014). On appeal, the Second Circuit modified and affirmed the judgment of the District Court, Chelsea Grand, LLC v. New York Hotel and Motel Trades Council, AFL-CIO, 629 F. App'x. 152, (2d Cir. 2015).

To summarize, in Chelsea I, the Courts found that Chelsea was bound to certain obligations with respect to the union recognition process for employees at Chelsea's hotel (card check and neutrality),[2] even though Chelsea did not want to be unionized, and never signed any agreement with the Hotel Workers Union. Chelsea's current complaint blames Interstate for this situation. Further, Chelsea argues that wages for the Hotel Workers Union members are higher than Chelsea wished to pay; and the higher wages would raise operating costs; which in turn decreases profits and reduces the value of Chelsea, thereby causing Chelsea damage.[3]

**Facts Established in Prior Litigation**

    A.    **Chelsea**

Chelsea is owned by the Lam group, a closely held family enterprise, headed by John Lam. Mr. Lam previously worked in the garment industry, but he decided to build a hotel in New York City. Mr. Lam sought an affiliation with a better known and higher quality hotel chain. Sheraton Hotels would not grant him a franchise, however, and instead insisted that Chelsea obtain a managing agent to operate the hotel. In February 2003, Chelsea entered into the HMA with Interstate to operate Chelsea's hotel, the Sheraton Four Points Hotel, on West 25th Street in Manhattan. Chelsea's franchise agreement with Sheraton specifically refers to

---

[2] Card check is a well-established procedure for employees to demonstrate that a majority of the employees wish to be represented by a labor organization, here the Hotel Workers Union. Whether a majority exists is frequently determined by an arbitrator.

[3] These damages are obviously consequential. Consequential damages are barred by Paragraph 15.5 of the HMA. Since the damages plaintiff seeks are not allowed, this is a further reason to dismiss the Complaint.

Interstate.  Interstate also helped Chelsea refinance the hotel with Merrill Lynch.  There is no doubt that Interstate was and is a skilled and well-regarded hotel manager/operator, which had numerous contacts in New York with the Hotel Workers Union as of February, 2003 when the HMA was executed.

**B.    Union Agreements with Hotel Association of New York City**

Major hotels in New York are usually members of the Hotel Association of New York City ("HANYC"), a multi-employer entity, which collectively bargains on behalf of its members with the Hotel Workers Union.  The parties' collective bargaining agreement—the Industry Wide Agreement ("IWA")—dates to 1990 and sets forth wages, benefits, as well as other terms and conditions of employment.  It also provides for card check and neutrality.

In 2000, the parties entered into a Memorandum of Understanding ("MOU") which became effective on June 1, 2001, modifying the terms of the existing IWA ("the 2001 IWA").  The MOU added an accretion clause which provided, that if a signatory became the owner or manager of another hotel in New York, it would be required to apply the IWA to that property on the basis of accretion.  In other words, if a manager of a hotel that is subject to the IWA takes on management of another hotel in New York City, such new hotel will be bound by the IWA, based on the doctrine of accretion.

As of 2000, Interstate managed two hotels in New York which were members of HANYC, and covered by the Industry Wide Agreement.  Thus, Interstate was bound by those provisions as of the date it executed the HMA with Chelsea.

On January 15, 2004, the Hotel Workers Union and Interstate[4] signed a Memorandum of Agreement ("MOA") which provided that the accretion and Card Count/Neutrality provision of

---

[4] The MOA was signed by IHR, not IMC.  As noted previously, for the purposes of this motion, the Court treats these two separate entities as one.

the 2000 MOU would be applied to any hotels which were owned, operated or managed by Interstate on July 1, 2001. None of these arrangements were secret, indeed, they were well known in New York City's hotel industry.

The net result of these agreements, all of which were subject to arbitration, was that Chelsea was bound by the Card Count/Neutrality provision as part of the union recognition process. The arbitration award so held; and that decision was confirmed by the District Court, and the Second Circuit affirmed.

**Current Dispute**

The gravamen of Chelsea's TAC is that it did not want a union; that its agent (Interstate) was well aware of Chelsea's position; and Interstate had both a contractual and fiduciary duty to not enter into such an agreement. The HMA (at paragraph 16.1), states specifically that Chelsea "desires to . . . operate . . . as a non-union hotel." Further, Chelsea never signed a union contract or an agreement to recognize the union. Chelsea alleges that the hotel was unionized because of Interstate's breach of contract (Count 1), and its intentional and/or negligent breach of fiduciary duty (Counts 2 and 3). Chelsea was forced to pay higher employee wages, which increased its operating costs, diminished profits and caused a diminution in value. Chelsea seeks damages in the amount of $30,000,000.

Interstate now moves to dismiss the complaint because the issues raised by the TAC were all resolved against Chelsea in the earlier litigation with the Hotel Workers Union. Specifically, defendants rely on two cases: Blonder-Tongue Labs., Inc. v. Univ. of Illinois Foundation, 402 U.S. 313 (1971), and Parklane Hosiery Company, Inc. v. Shore, 439 U.S. 322 (1979). In Blonder-Tongue, the Court overruled its prior ruling that a determination of patent invalidity was not res judicata against the patent holder in subsequent litigation against a different defendant.

Instead, the Court held "that the holder of a patent should not be insulated from the assertion of defenses and thus allowed to exact royalties for use of an idea that is not in fact patentable . . ." Id. at 349-350. The principle of mutuality of estoppel was limited. Pleas of estoppel were allowed to those "facing a charge of infringement of a patent that has once been declared invalid." Id. at 350.

The Supreme Court found no good reason to allow a plaintiff who has "fully litigated and lost in a prior action" to relitigate the same issue simply because a different defendant was targeted. Id. at 329. "Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or a lack of discipline and of disinterestedness," not worthy of the judicial system. Id. at 329 (citation omitted).

Parklane Hosiery Company, Inc. v. Shore, 439 U.S. 322 (1979), involved a stockholders class action brought against a corporation, its officers and directors, for filing a false and misleading proxy statement. Before the class action came to trial, the SEC initiated an enforcement action alleging that the proxy statement was materially false and misleading in the same way. When the SEC prevailed, the class action plaintiffs sought summary judgment on the issue of liability, arguing that the corporation, its officers and directors were estopped from relitigating the issues resolved against them in the SEC's action.

The issue for the Court was:

> Specifically, we must determine whether a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding.

> Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. Id. at 326.

Defensive use of collateral estoppel, which is what Interstate seeks, "precludes a plaintiff from relitigating issues by merely 'switching adversaries.'" Id. at 329 (citation omitted).

**There is No Breach of Contract as Alleged in Count 1**

The thrust of Chelsea's complaint is that it did not want its work force to be unionized; it so advised Interstate; but notwithstanding such advice, Chelsea was forced to deal with a card check and neutrality provision of an agreement which Interstate had signed with the Hotel Workers Union in 2004, after the HMA was signed in February, 2003.

Chelsea places extraordinary emphasis on the first sentence of ¶ 16.1 of the Hotel Management Agreement between Chelsea and Interstate as of February, 2003. The sentence reads:

"Operator (i.e., Interstate) hereby acknowledges that Owner (Chelsea Grand) desires to open and operate the Hotel as a non-union hotel." This language imposes no duty on Interstate; it merely states what Chelsea wishes.

Passing for a moment the legality or propriety of Chelsea's "desire," the wishful language is followed by the further caveats, which specify that the Operator (i.e., Interstate) is not required to assist Chelsea in resisting unionization:

> Owner acknowledges and agrees that (a) Operator will not
> participate or assist Owner in resisting any union campaign or
> organization efforts by any union, and (b) Operator and its
> affiliates manage other unionized hotels in New York City area
> (including any airport markets servicing the New York City or
> surrounding areas) and organizational efforts by union(s) with
> respect to the Hotel employees may affect, disrupt, hinder or
> interfere with the normal operations at such other hotels managed
> by Operator and its affiliates.  If at any time during the Operating
> Term, Operator determines that the operations or labor relations at
> the other hotels managed by Operator and its affiliates, are
> interfered with, disrupted, hindered or affected as a result of labor
> relations or labor unrest at the Hotel between the Hotel, its

employees or any union (or lack of any collective bargaining
agreement in effect for the Hotel) ("Labor Issues"), Operator shall
have the right, without penalty, to terminate this Agreement by
providing to Owner at least one hundred twenty (120) days prior
written notice of termination unless Owner cures such Labor Issues
to the satisfaction of Operator (which satisfaction will not be
deemed given unless acknowledged in writing by Operator) within
ninety (90) days of Owner's receipt of such notice, in which case
the notice of termination shall be deemed rescinded.

As of 2001, two years before the HMA was signed, Interstate and the Hotel Workers

Union were parties to an IWA which obligated hotel owners and managers to provide the Hotel

Workers Union with access to hotel employees to allow organization of the employees through a

card check process and to remain neutral throughout the Hotel Workers Union organization

campaign.  The IWA was modified by a MOU, effective as of June 2, 2001, which added an

accretion clause.  That clause provided that if an owner or manager of a hotel which is subject to

the IWA became the owner or manager of another hotel property in the New York area, the new

hotel would be bound by the IWA.

As was established at trial in <u>Chelsea I</u>, Chelsea knew about the arrangement; and just as

obviously, the parties provided for the contingency of what might happen during any union

recognition campaign.  Chelsea also approached the union about wage rates.[5]  The concern was

not so much about a unionized work force, but rather the wages that would be paid to the hotel

workers.  Mr. Lam was willing to take a unionized work force, so long as the wages were

equivalent to what he paid workers in his garment factories.  When Chelsea entered into the

HMA, however, it took Interstate as it found it.  That is to say—as an entity capable of obtaining

Chelsea a Sheraton franchise; and capable of getting a development loan from Merrill Lynch, but

also with a prior relationship with the Hotel Workers Union.  What Chelsea wants to do is keep

---

[5] Edgar Romney was an officer in the Garment Workers Union which merged with the Hotel Workers Union.
Romney's testimony was that Messrs. Lam and Luk of Chelsea wanted to pay garment workers' wages to hotel
employees, rather than the higher wages paid to workers represented by the Hotel Workers Union.

the benefits of the HMA, but shed its burdens. Chelsea and Mr. Lam knew about the IWA's applicability to the hotel in early 2003. Charged with this knowledge, and having vested Interstate with apparent authority, Chelsea must bear responsibility for the unionization of the hotel. Paragraph 16 of the HMA creates no duty or contract obligation owned by Interstate to Chelsea.

A reading of the plain language of Paragraph 16 in its entirety makes clear that the first sentence does not stand alone. Rather, the subsequent language provides that Interstate need play no role in implementing Chelsea's desire expressed in the first sentence; and Interstate will suffer no consequence. Furthermore, the Court determined in Chelsea I that Paragraph 16 imposed no duty on Interstate. Under the teaching of Blonder-Tongue and Parklane Hosiery, Chelsea is not allowed to relitigate this same issue against Interstate.

There is no legal basis for Count 1 and, accordingly, Chelsea's breach of contract claim is dismissed.

**There Is No Fiduciary Duty As Alleged In Counts 2 And 3**

The two breach of fiduciary duty counts alleged by Chelsea are based on its allegation that Interstate was its agent and therefore owed Chelsea a fiduciary duty. But there is no fiduciary duty, and so there can be no breach of that non-duty, either intentionally or negligently. The hotel business is a hard driving, entrepreneurial industry. It is not one in which Judge Cardozo's description of fiduciary duty—"the punctilio of an honor the most sensitive." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928)—is readily applicable.

The HMA provides for an arms-length relationship; and the allocation of the Owner's and Operator's duties and responsibilities. Chelsea asserts that the following paragraphs from the HMA create a fiduciary duty:

3.2  The operator (Interstate) as agent for the owner to perform
enumerated tasks.
4.1  The operator is the exclusive operator of the hotel.
5.1  "... the operator shall act solely as agent of owner", but will
not be construed as a "partnership or joint venture between owner
and operator."
6.1  Operator shall act solely as agent for the account of the owner,
but will not be in default if there is a lack of funds from the
operator of hotel or as otherwise provided by owner.

Those same provisions were considered in <u>Chelsea I</u>.  They were held to demonstrate an

arms-length arrangement between Chelsea and Interstate concerning the operation of a hotel in

New York City.  Paragraph 3.2 provides that the "operator, as agent and for the account of

owner, shall in accordance with the Budget . . . and <u>only</u> to the extent owner has provided

sufficient funds therefor . . .

A.  Recruit; train, direct supervision employ . . . staff ("the Hotel
Employees") for the operation of the Hotel.
B.  Develop and implement advertising.

The list continues with the Operator agreeing to obtain necessary licenses, do routine

accounting, take care of repairs and maintenance.  All of the duties depend on Chelsea providing

funds for the hotel's operation.  None of these apportionments of responsibility suggest the

creation of a fiduciary obligation.  Indeed, in Paragraph 5.1, the two legal relationships—

partnership and joint venture—which might be said to create indicia of a fiduciary duty, are

specifically rejected.

Paragraph 6.1 makes it clear, as do the other enumerated provisions, that the Operator's

performance was contingent on Owner providing funds.  This is a further indicia of what can

only be called an arms-length bargain.

Additionally, the issue of Interstate's status as agent and fiduciary was litigated in

<u>Chelsea I</u>.  The Court held that Interstate was neither the express nor implied agent of Chelsea.

Chelsea was held to be a joint employer with Interstate and Interstate was cloaked with apparent authority to act as it did.  The HMA was strictly an arms-length business transaction between two sophisticated business parties.  There was no fiduciary relationship.  Under the teaching of Parklane Hosiery and Blonder-Tongue, Chelsea may not litigate again on the issues which it previously tried and lost.

The defendants' motion is granted; the Third Amended Complaint is dismissed.  The Clerk of the Court is directed to enter judgment dismissing this case and to close the matter.

Dated:  New York, New York
         March 30, 2017

                                        SO ORDERED

                                        PAUL A. CROTTY
                                        United States District Judge

10